# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| TOLL PROCESSING SERVICES, LLC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> KASTALON, INC., KASTALON ) <br> POLYURETHANE PRODUCTS, and ) <br> KASTALON, INC. t/d/b/a KASTALON ) <br> POLYURETHANE PRODUCTS, ) <br> ) <br> Defendants. ) <br> _____ ) <br> KASTALON, INC., ) <br> ) <br> Counter-Plaintiff, ) <br> v. ) <br> ) <br> TOLL PROCESSING SERVICES, LLC, ) <br> ) <br> Counter-Defendant. ) | Case No. 12-cv-10058 <br><br> Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Toll Processing Services, LLC, ("Toll Processing"), finds itself in the following pickle. Toll Processing's three-count Amended Complaint alleges conversion, negligence, and breach of contract against defendant Kastalon, Inc. ("Kastalon") stemming from an alleged oral contract to store 57 pickle line rolls ("rolls"), which Kastalon sold for scrap after almost three years. The parties each filed for summary judgment in their favor [84, 90]. The Court heard oral arguments on the motions on July 6, 2015. For the reasons stated herein, the Court grants summary judgment in favor of Kastalon and against Toll Processing.

**Background**

The following facts are not in genuine dispute. Toll Processing is a subsidiary of International Steel Services, Inc., and its purpose is to own and operate a pickle line, which is a type of equipment used in the steel industry. Toll Processing has no current employees or revenue and its

1

principal asset is the pickle line, according to Malvin Sander, Vice President, General Counsel and Secretary of International Steel Services.

In 2006, Toll Processing purchased a pickle line "as-is, where-is" from Joseph T. Ryerson & Sons ("Ryerson") for $2,000,000. (Kastalon L.R. 56.1 Statement of Facts ("SOF"), Dkt. 91 at ¶ 6). Part of the pickle line included rolls used to guide pieces of steel through acids tanks to clean the steel. (*Id.* at ¶¶ 7, 8). The rolls consist of two parts, the steel core and the polyurethane cover. (Toll Processing L.R. 56.1 SOF, Dkt. 86 at ¶ 12). The evidence presented does not conclusively provide the exact number of rolls, varying between 57 and 60. Ultimately, the parties seem to agree there were 57 rolls. (Toll Processing L.R. 56.1(b)(3) Resp. to Kastalon SOF, Dkt. 97 at ¶9). Not all the rolls were from the 1989 original, but it is unknown how many are from 1989 or how many were replaced sometime between 1989 and 2006. (*Id.*). The maintenance history of the rolls is also unknown with any certainty, though Carlos Monzon, an employee of Ryerson and then Toll Processing, testified that Ryerson did regular maintenance on the pickle line. (*Id.* at ¶¶ 10-12). Several of the rolls were refurbished in November and December 2006 before the sale to Toll Processing. (Dkt. 86 at ¶ 21; Kastalon L.R. 56.1(b)(3) Resp. to Toll Processing SOF, Dkt. 94 at ¶ 14).

Kastalon is located in Alsip, Illinois, and provides equipment and repairs for the steel industry. (Dkt. 86 at ¶ 2). Michael DeMent is Vice President of Kastalon and dealt regularly with Paula Dent and Carlos Monzon at Ryerson and continued to deal with Paula Dent when she worked for Toll Processing after the sale of the pickle line. (Dkt. 97 at ¶ 21). Paula Dent was employed by Ryerson Coil Processing for 17 years and worked for Toll Processing as the Plant and Project Manager for one year (April 2007-April 2008) as Toll Processing closed down and disassembled the pickle line. (Dkt. 86 at ¶ 9). Gus Schempp was her supervisor, though she worked out of the Ryerson facility. (Dkt. 91 at ¶ 30). Gus Schempp is a consultant retained by Toll Processing to execute the pickle line project. (Dkt. 91 at ¶ 22).

In April 2007, Toll Processing began to disassemble the pickle line on Ryerson's property, using former Ryerson employees hired by Toll Processing. (Dkt. 97 at ¶ 24). In April 2008, when the disassembly of the pickle line was complete, the employees hired by Toll Processing from Ryerson were laid off because Toll Processing could not afford payroll to continue without a firm commitment to relocate the pickle line. (Dkt. 97 at ¶ 27). No one informed Kastalon that Paula Dent, Kastalon's main contact person regarding the pickle line, had been laid off. (Dkt. 91 at ¶ 32).

After Paula Dent was laid-off, Michael DeMent of Kastalon called Gus Schempp, and they exchanged emails. (Dkt. 97 at ¶ 32).

Malvin Sander, an officer and attorney for Toll Processing, who was responsible for negotiating the purchase of the pickle line from Ryerson, did not recall looking at the rolls individually, but he inspected the pickle line assets as a whole. He did not personally document the condition of the pickle line. (Dkt. 91 at ¶ 34). Schempp never inspected the rolls, does not know the age of the rolls, does not know what needed to be done to the rolls, and does not know the value of the rolls when they were purchased from Ryerson. (*Id.* at ¶ 35).

Paula Dent orally contacted Michael DeMent in January 2008 to arrange for the rolls to go to Kastalon. (*Id.* at ¶ 38). DeMent knew that Toll Processing had purchased the pickle line and was planning to disassemble it and rebuilt it at another location. (*Id.* at ¶ 39). In early 2008, Kastalon transported the rolls in four shipments from Ryerson's facility at 720 E. 111th Street in Chicago to Alsip for storage at its facility. (*Id.* at ¶ 40). Initially the rolls were stored inside Kastalon's building. (*Id.*) Paula Dent did not specifically discuss with DeMent whether the rolls were to be kept inside or outside. (*Id.* at ¶ 45). When the rolls arrived at Kastalon some of them needed repair. (Dkt. 97 at ¶ 42). No one from Toll Processing inspected or viewed the Rolls at Kastalon at any point in time. (Dkt. 91 at ¶ 43).

Paula Dent was aware that Kastalon expected to be compensated for the shipment and storage of the rolls. (*Id.* at ¶ 46). Schempp authorized and directed Dent to contact Kastalon to have the rolls transported and stored at Kastalon's facility. (Dkt. 86 at ¶ 20). Malvin Sander testified that Dent had no authority to enter into contracts on behalf of Toll Processing unless Schempp authorized it. (Dkt. 91 at ¶ 48). Although no specific time frame for storage was discussed, Kastalon believed it would be a short time, and Schempp testified that both parties initially believed that the plan to re-install the pickle line would be completed "in the ensuing months." (Gus Schempp Dep. Tr. at 155:3-16). Schempp could not answer the question of what Kastalon's obligations would be if Toll Processing never issued a purchase order to Kastalon. (Dkt. 97 at ¶ 50). Sander testified that he agreed it would be unreasonable for Toll Processing to expect Kastalon to hold onto the rolls forever. (Dkt. 91 at ¶ 52).

After March 2008, Paula Dent had no contact with Kastalon about the rolls. (*Id.* at ¶ 53). In October 2008, DeMent called Schempp regarding the rolls and also sent him an email requesting to be informed about the progress of the pickle line. (*Id.* at ¶ 54). The rolls were stored inside Kastalon for approximately two years and moved once to a different location inside the building, requiring a

3

crane and 4 to 5 hours of labor. (*Id.* at ¶¶ 55-56). The rolls were greased, wrapped, taken outside of Kastalon's building, stacked, and covered with tarps to protect them from the elements, which took approximately 10 hours of labor. (Dkt. 97 at ¶ 57). Robert Snyder, Plant Manager at Kastalon, testified that the condition of the rolls did not change while in Kastalon's possession. (Dkt. 91 at ¶ 58).

Sometime in November or December 2010, prior to disposal of the rolls, DeMent contacted Paula Dent and Carlos Monzon to ask about the status of Toll Processing. (*Id.* at ¶ 63). In response to DeMent's inquiry about the company, Dent and Monzon informed him only they were still unemployed. (*Id.*) DeMent did not ask the status of the rolls or inform either Dent or Monzon that Kastalon intended to dispose of the rolls. (Dkt. 86 at ¶ 27). No one at Kastalon inspected the rolls to determine their condition prior to disposal. (*Id.* at ¶ 28). In December 2010, Kastalon had the rolls scrapped by a local recycler and received $6,380.80. (Dkt. 91 at ¶ 67). In June 2011, Schempp called DeMent who informed Schempp that the rolls had been scrapped. (Dkt. 86 at ¶ 30; Dkt. 91 at ¶ 68). Schempp stated at a meeting in August 2011 of representatives of Toll Processing and Kastalon that he could "kick himself" for not calling Kastalon because he might have been able to prevent the scrapping of the rolls. (Dkt. 91 at ¶ 69).

In 2011, Toll Processing obtained quotes for replacement rolls for the pickle line from various companies, the lowest of which was $311,750, plus $104,945 for the roll covers (quote from Kastalon), for a total replacement cost of $416,695. (*Id.* at ¶¶ 38-39).

**Legal Standard**

A party is entitled to summary judgment if all of the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When considering a summary judgment motion, the Court construes the facts and all reasonable inferences in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). On cross-motions, summary judgment is appropriate only when evidence as a whole shows there is no genuine dispute as to any material fact, *Davis v. Time Warner Cable of Southeastern Wis., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011), regardless to which motion the evidence is attached. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

4

**Discussion**

Toll Processing moves for summary judgment in its favor on each count of the complaint. Kastalon cross-moves for summary judgment in its favor on each count of the complaint, and also moves for summary judgment on its counterclaim for unjust enrichment or quantum meruit. The Court will address each count in turn.

*1. Count I: Conversion*

Toll Processing moves for summary judgment in its favor on its conversion claim, arguing that it contracted with Kastalon for the transportation and storage of the rolls and that Kastalon wrongfully converted the rolls by selling them for scrap without consulting Toll Processing. In order to establish a claim for conversion Toll Processing must establish that it has a right to the property, an absolute and unconditional right to immediate possession, that it made a demand, and Kastalon wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 115 (1998).

Kastalon argues that it is entitled to summary judgment in its favor because Toll Processing failed to make a demand for return of the rolls. Toll Processing asserts that there was a demand when Gus Schempp called Mike DeMent to request a quote for reconditioning the rolls in June of 2011. Toll Processing alternatively claims that a demand is unnecessary because there was an independent act of conversion in the form of Kastalon selling the rolls to a recycler. *See Fortech LLC v. RW Dunteman Co.,* 366 Ill. App. 3d 804, 852 N.E. 2d 451, 462 (2006); *Pavilon v. Kaferly*, 204 Ill. App. 3d 235 (1990).

Even if Toll Processing made a demand, it came too late. Toll Processing abandoned the rolls. A party claiming abandonment of the property must prove intent to relinquish rights to the property. *See Michael v. First Chicago Corp.*, 139 Ill. App. 3d 374, 382, 487 N.E.2d 403 (2d Dist. 1985). Kastalon argues it can show abandonment as a matter of law if the property is left "unexplained" for a "considerable period of time" or "unreasonable period of time." *Spies v. DeMayo,* 396 Ill. 255, 275 (1947) (27 months was unreasonable); *see also Pieszchalski v. Oslager*, 128 Ill. App. 3d 437, 448 (5th Dist. 1984) (2 years was unreasonable); *Shannon v. Stookey*, 59 Ill. App. 3d 573, 576 (5th Dist. 1978) (5 months was not unreasonable). This Court agrees with Kastalon that Toll Processing abandoned the rolls by not communicating with Kastalon at all between early 2008 when Kastalon transported the rolls for storage and June 2011 when Gus Schemp called to request a quote. Accordingly, this Court finds that Kastalon's abandonment of the rolls negates its claim for conversion.

5

Even if this Court did not find that Toll Processing had abandoned the rolls, the economic loss doctrine ("the *Moorman* Doctrine") bars recovery for purely economic loss in tort. Toll Processing contends that it is at least entitled to $6,380.80, the scrap value of the rolls. There is a dearth of authority applying the *Moorman* Doctrine to conversion claims, but a couple cases in this district provide some guidance. In *Vanco US, LLC v. Brink's Inc.,* the district court found the economic loss doctrine did not bar the conversion claim where the loss stemmed from the plaintiff pocketing defendant's money that was meant to pay the defendant's ISPs. *Vanco US, LLC, v. Brink's Inc.,* No. 09 C 6416, 2010 U.S. Dist. LEXIS 133997, *16 (N.D. Ill. Dec. 14, 2010) (Darrah, J.). There, the court found that the loss was not the type of "economic loss" contemplated by the doctrine. *Id.* In *Lansing v. Carroll*, on the other hand, the district court found that the economic loss doctrine barred the defendant's conversion claim because the defendants were only seeking to recover for harm to a contract-like interest. *Lansing v. Carroll*, No. 11 C 4153, 2012 U.S. Dist. LEXIS 144250, *10-11 (N.D. Ill. Oct. 5, 2012) (Lefkow, J.). In *Lansing*, the court noted and cited the cases indicating a split in the application of the economic loss doctrine to conversion claims. *Id.* at *8-9 (collecting cases). Ultimately, however, the court found that there was no extra-contractual duty to the defendant not to convert his property. In so finding the court followed *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567 (7th Cir. 2012), and considered "the key question [to determine the application of the *Moorman* Doctrine] is whether the defendant's duty arose by operation of contract or existed independent of the contract." *Id.* at *7. Here, the *Moorman* doctrine bars Toll Processing's conversion claim because it alleges a purely economic loss stemming from Kastalon's alleged contractual duty to store the rolls and not to convert them to its own purposes.

This Court finds that thirty-two months of storage with no definite stated time parameter and no communication is unreasonable and constitutes abandonment. Although it may have been prudent for Kastalon to inform Toll Processing of its intention to sell the rolls as a courtesy, Kastalon did not unreasonably believe that Toll Processing had abandoned the rolls after such a length of time with no demand. Even if Toll Processing had not abandoned the rolls, this Court finds that Toll Processing cannot recover damages for conversion because the *Moorman* economic loss doctrine applies.

*2. Count II – Negligence*

"'A bailment is the delivery of property for some purpose upon a contract, express or implied, that after the purpose has been fulfilled, the property shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept until he reclaims it.'" *Wausau Ins. Co. v. All*

6

*Chicagoland Moving & Storage Co.,* 333 Ill. App. 3d 1116, 1121 (2d Dist. 2002) (quoting *American Ambassador Casualty Co. v. Jackson,* 295 Ill. App. 3d 485, 490, 229 Ill. Dec. 728, 692 N.E.2d 717 (1998)). To recover under a bailment theory, a plaintiff must establish (1) an express or implied agreement to create a bailment; (2) a delivery of the property in good condition; (3) the bailee's acceptance of the property; and (4) the bailee's failure to return the property or the bailee's redelivery of the property in a damaged condition. *Id.*

A prima facie case of bailment creates a rebuttable presumption that the defendant acted negligently. *Id.* A bailee is not the insurer of the bailed property, but the bailee must exercise reasonable care under the circumstances. *Id.* (citing *Ortiz v. Warren Chevrolet, Inc.,* 24 Ill. App. 3d 199, 202, 321 N.E.2d 77 (1974)). Whether a bailee exercised reasonable care under the circumstances is ordinarily a question of fact, but may be decided as a matter of law on summary judgment if the undisputed facts conclusively demonstrate that the bailee has exercised its duty. *Id.*

From the undisputed facts there seems to be an implied bailment, the rolls were delivered, and not returned. However, this claim fails for the same reason that Toll Processing's conversion claim fails. Kastalon's duty was only to act with reasonable care. The fact that no particular duration for any purported bailment was agreed upon, it was reasonable for Kastalon, which is not a storage facility, to conclude that Toll Processing had abandoned the rolls after thirty-two months with no contact. Accordingly, this Court finds against Toll Processing and in favor of Kastalon on the negligence count.

*3. Count III – Breach of Contract*

"Oral agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement. The terms of a contract will be found to be definite and certain, and therefore the contract enforceable, if a court is able to ascertain what the parties have agreed to, using proper rules of construction and applicable principles of equity." *Bruzas v. Richardson,* 408 Ill. App. 3d 98, 105, 945 N.E. 2d 1208, 1215 (1st Dist. 2011).

Toll Processing asserts that the parties have a valid and enforceable oral contract that was created when Paula Dent contacted Kastalon and Kastalon agreed to transport and store the rolls in exchange for Toll Processing using Kastalon's refurbishing services when it came time to repossess and put the rolls back into use. Kastalon argues that there is no enforceable contract because Paula Dent had no authority to enter a contract on behalf of Toll Processing, there was no meeting of the minds as to the terms of the agreement, and there is no consideration since Toll Processing was never obligated to use Kastalon for the repairs. Thus, Kastalon contends that Toll Processing's

7

promise was illusory. *See Carter v. SSC Odin Operating Co. LLC,* 2012 IL 113204, 976 N.E. 2d 344, 351 (Ill. 2012).

Although there was perhaps an attempt to formulate a contract, it fails for indefiniteness and lack of consideration. Further, there does not appear to have been a meeting of the minds on the duration of the contract. Kastalon is adamant that it believed that Toll Processing was only going to store the rolls at its facility for a short period of time, a belief bolstered by the fact that Kastalon was not a storage facility. For its part, Toll Processing insists that there was no limit on duration. According to Toll Processing, Kastalon was to store the rolls until Toll Processing issued a purchase order for Kastalon to refurbish the rolls, an eventuality that Toll Processing admits might never happen. Toll Processing's assertion that Kastalon assumed the risk that Toll Processing might never have Kastalon refurbish the rolls must fail. In order for a valid contract to exist there must be consideration. An illusory promise cannot act as consideration. "'Where there is no other consideration for a contract the mutual promises of the parties constitute the consideration, and these promises must be binding on both parties or the contract falls for want of consideration[.]'" *Carter v. SSC Odin Operating Co., LLC,* 2012 IL 113204, P21 (Ill. 2012) (quoting *Armstrong Paint & Varnish Works v. Continental Can Co.,* 301 Ill. 102, 108, 133 N.E. 711 (1921)). Here, there was nothing to bind Toll Processing. Accordingly, this Court finds there was no contract, Toll Processing cannot prevail on this claim, and Kastalon is entitled to judgment in its favor.

**Conclusion**

Based on the foregoing, this Court grants summary judgment in favor of Kastalon on all three counts of the complaint [90] and denies summary judgment in favor of Toll Processing [84]. At oral argument on the motions, Kastalon stated on the record that it would withdraw its counterclaims for unjust enrichment and *quantum meruit* if this Court found in favor of Kastalon and against Toll Processing on the conversion, negligence, and breach of contract claims. Judgment as a matter of law is therefore entered in favor of Kastalon and against Toll Processing. Civil case terminated.

IT IS SO ORDERED.

Date: 9/4/15

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge